Mary T. MORTON, et vir, David M. Morton, Plaintiffs,

v.

ABBOTT LABORATORIES, et al., Defendants.

No. 80–933 Civ. T–K.

United States District Court, M. D. Florida, Tampa Division.

March 25, 1982.

Robert F. Nunez, Roger S. Tucker, St. Petersburg, Fla., for plaintiffs.

Tom Mazza and A. Broaddus Livingston, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P. A., Tampa, Fla., for Eli Lilly & Co.

David J. Kadyk, Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., for The Up-John Co.

R. Layton Mank, Miami, Fla., for ER Squibb.

Roy B. Dalton, Jr., Dean, Ringers, Morgan & Lawton, P. A., Orlando, Fla., for Abbott Lab.

## ORDER

KRENTZMAN, Chief Judge.

This is a product liability action brought against eight drug manufacturers, four of whom have been served. Plaintiff Mary Morton [1] alleges that she contracted vaginal adenosis as a result of her mother's use of

---

1. David M. Morton joins his wife, Mary T. Morton, as co-plaintiff in this case.

the drug diethylstibestrol (DES) while plaintiff was *in utero.* Plaintiff does not allege which drug company manufactured the pills taken by her mother. *See* Amended Complaint ¶ 32. Rather, she alleges that the defendant drug companies manufactured a substantial share of the DES pills produced during the period in question, and argues various theories to support liability without the necessity of proving which company manufactured the pills in question. Defendants do not deny that they manufactured the drug DES during the period in question. Instead, they state, by motions for summary judgment, that at least 149 drug companies manufactured DES during that period, any one of which might have produced the pills taken by plaintiff's mother. Plaintiffs have responded to the motions for summary judgment, and have documented their response by filing a certified transcript of portions of the deposition testimony of Dr. Don Carlos Hines, taken in *Bichler v. Eli Lilly and Co.*, Index No. 15600/74 (Sup.Ct.Bronx County, New York).

The motions for summary judgment were heard by the Court. At hearing, which was attended by plaintiffs Mary T. and David M. Morton, counsel for plaintiffs filed a motion to continue the hearing and a motion to withdraw. The proceedings were reported, and are available for transcription if required. For the reasons stated at hearing, the motions to continue and withdraw were and are DENIED.

■■■ The issue raised in the motions for summary judgment is whether these defendants may be held liable without proof that one, or indeed any, of them manufactured the pills that caused plaintiff's injury. Plaintiff argues that this issue cannot be decided at the summary judgment stage, as its determination raises contested questions of fact. A motion for summary judgment is to be granted if the pleadings, discovery, and the documentation supporting the motion reveal no "genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A properly supported motion for summary judgment cannot be resisted on mere allegations alone; such a motion "pierces" the pleadings and tests whether the factual dispute is "genuine." *Joe Regueira, Inc. v. American Distilling Co.*, 642 F.2d 826, 829 (5th Cir. 1981). By their motions for summary judgment, defendants attack the element of causation. This use of the summary judgment mechanism is entirely appropriate. *See* 10 C. Wright & A. Miller, Federal Practice and Procedure § 2729 (1973).

■■■ Plaintiff in a product liability action must ordinarily prove that a manufacturer defendant produced the product that allegedly caused the injury. *See* Restatement (Second) of Torts §§ 402A, 433B (1965); *W. Prosser, The Law of Torts* § 98 (1971). Florida has expressly adopted the doctrine of strict liability in tort as formulated in the Second Restatement of Torts, § 402A. *West v. Caterpillar Tractor Co.*, 336 So.2d 80 (Fla.1976). In so doing, the Supreme Court of Florida adhered to the traditional principle of causation in such cases: "In order to hold a manufacturer liable . . . the user must establish the manufacturer's relationship to the product in question . . . ." *Id.* at 87. The courts of Florida have enforced this requirement. *See, e.g., Matthews v. GSP Corp.*, 368 So.2d 391 (Fla.App.1979).

■■■ Plaintiff relies on several legal theories in support of her argument that recovery is available without proof of which drug company actually manufactured the pills in question. The first two theories concern joint torts: plaintiff would establish the liability of several companies jointly under the "concert of action" or "enterprise liability" theories, thereby entitling her to recover from those joined as defendants. The requirement of causation remains intact under these theories. The last two, however, are novel theories of causation rather than of joint liability: plaintiff argues that the Court should overlook the flaws in traditional causation under either the theory of "alternative liability" or that of "market share." Each of these four theories will be discussed below.

### A. Concert of Action.

Relying on the concert of action theory of joint tort liability, plaintiffs would hold these several defendants liable for having acted in concert with each other and other drug manufacturers in causing her injury. Specifically, plaintiffs allege that the drug companies acted in concert "in the testing, manufacturing, distribution, promoting, marketing and sale of DES and the dissemination of literature regarding DES to practicing physicians." Amended Complaint ¶ 26. Further, plaintiffs allege that defendants are liable for manufacturing and selling DES "with identical chemical constituency by a mutually agreed-upon formula," thereby enabling the marketing of DES as a generic drug and preventing consumers from identifying the manufacturer. *Id.* ¶ 27.

The concert of action concept is generally accepted in the courts of this country, and has been embraced by the Supreme Court of Florida for years. *See Symmes v. Prairie Pebble Phosphate Co.*, 66 Fla. 27, 63 So. 1 (1913); *Standard Phosphate Co. v. Lunn*, 66 Fla. 220, 63 So. 429 (1913); *Skroh v. Newby*, 237 So.2d 548 (Fla.App.1970); *Prosser, supra*, § 46. Dean Prosser has stated the doctrine as follows:

> All those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify or adopt his acts done for their benefit, are equally liable with him.

*Prosser, supra* at 292 (footnotes omitted).[2] The classic example of such liability is the drag race: *A* and *B* are illegally racing when *A* injures *C*. *A* and *B* are jointly and severally liable because their concerted tortious conduct caused *C*'s injuries. *See, e.g., Skroh v. Newby, supra.* The parties have cited no Florida case setting out the elements of concert of action. The decisions that have been noted either do not apply the doctrine or apply it without discussion. *See, e.g., Insurance Field Services, Inc. v. White and White Inspection and Audit Service, Inc.*, 384 So.2d 303 (Fla.App.1980); *Bermil Corp. v. Sawyer*, 353 So.2d 579 (Fla. App.1977); *Skroh v. Newby, supra.*

Several courts have reviewed the concert of action theory in the course of deciding DES cases. In *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 607 P.2d 924, 163 Cal. Rptr. 132, *cert. denied* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980), the Supreme Court of California relied on the Restatement formulation and on Dean Prosser's admonition that "express agreement is not necessary, and all that is required is that there must be a tacit understanding." *See Prosser, supra* § 46. Other courts have emphasized that, in order to support liability under the concert theory, a defendant's conduct must itself have been tortious. *See Payton v. Abbott Labs*, 512 F.Supp. 1031, 1035 (D.Mass.1981); *Lyons v. Premo Pharmaceutical Labs, Inc.*, 170 N.J. Super. 183, 406 A.2d 185, 190 (App.Div.), *cert. denied*, 82 N.J. 267, 412 A.2d 774 (N.J. 1979). *See also* Restatement (Second) of Torts § 876, comment b (1979).

█ This Court agrees with the vast majority of courts that have considered the question: the DES manufacturers simply did not act in concert as that concept is defined in tort law.[3] Their filings with the Food and Drug Administration (FDA) did not represent concerted tortious conduct. In 1940, several companies filed wholly separate applications with the FDA to market DES. By these applications, the manufacturers sought to market DES for purposes

---

**2.** *See also* Restatement (Second) of Torts §§ 875, 876 (1979).

**3.** The facts surrounding the FDA applications and the marketing of DES are taken from the deposition of Dr. Theodore G. Klumpp, Chief of the Drug Division of the FDA in 1941; the affidavit and deposition testimony of Dr. D.C. Hines, Lilly's "medical monitor" for DES from 1940 to 1952; and the affidavit of Dr. Jerome M. Maas, a former Lilly employee. They have been verified by reference to court decisions in other DES cases, in which the same theory was raised by plaintiff. On a motion for summary judgment, the facts are, of course, viewed in the light most favorable to the opponent of the motion, the plaintiff.

unrelated to pregnancy.[4] The FDA rejected these several applications, requiring the companies to coordinate a single "master" filing of clinical data. *See Lyons, supra*, 406 A.2d at 189; Klumpp deposition at 72. The manufacturers formed a "small committee" to assemble the data into a master clinical file, and this file was submitted to the FDA in 1941. Thereafter, the several companies each resubmitted their applications. The master filing was not concerted tortious conduct for two reasons. First, the act of filing a unified compilation was at the request of the FDA. *Ryan v. Eli Lilly & Co.*, 514 F.Supp. 1004, 1014 (D.S.C.1981). Second, and more importantly, the master filing related to the marketing of DES for purposes other than those for which it has been shown or is alleged to be dangerous. Selling prescription drugs for such purposes can hardly be considered tortious. *Lyons, supra*, 406 A.2d at 191. It was not until several years later, in 1947, that drug manufacturers began applying to the FDA for permission to sell DES for pregnancy-related purposes, and these filings were made completely independently. *See id.; Payton, supra* at 1038; Hines Affidavit ¶ 31.

The activities of the manufacturers after the FDA began approving DES for use to prevent miscarriage also fail to suggest any concerted activity. There is simply no indication of any conduct that might conceivably raise an inference that a tacit understanding or common plan existed among DES manufacturers.[5] One argument in this connection deserves special mention: plaintiffs assert that each manufacturer marketed DES according to the same chemical formula, and that this somehow grounds a charge of concerted conduct. DES, it can be said, is DES; the defendants could not market the active ingredient in DES according to any formula other than that prescribed in the United States Pharmacopoeia. 21 U.S.C. § 351 (1976).

The only DES case to find liability on the concert theory is *Bichler v. Eli Lilly & Co.*, 79 A.D.2d 317, 436 N.Y.S.2d 625 (1st Dep't 1981).[6] The *Bichler* court purported to expand the doctrine, finding that a "tacit agreement" among defendants could be inferred from their "conscious parallel conduct." *Id.* 436 N.Y.S.2d at 631–33. The court found this damning conduct in the manufacturers' "pooling of information" and use of a model package insert in the 1941 master filing and in their marketing of DES using the "same basic chemical formula." *Id.* 436 N.Y.S.2d at 633. As discussed above, these actions cannot lead to a finding of tacit agreement in a DES case.[7]

Accordingly, this Court concludes that the documents supporting the motion for summary judgment, including the deposition testimony of Dr. Hines, fail to raise a

---

4. The applications made in 1940 and 1941 sought FDA approval for the marketing of DES to relieve symptoms of menopause, vaginitis, engorgement of the breasts, and excessive menstrual bleeding. Klumpp deposition at 29. Use of DES for purposes unrelated to pregnancy is apparently still permitted by the FDA. *See Payton, supra* 512 F.Supp. at 1034.

5. "[T]he history of stilbestrol, far from showing joint conduct, demonstrates an independent, competitive response to a widely acclaimed medical discovery, all under the regulatory supervision of the FDA." *Ryan v. Eli Lilly & Co.*, 514 F.Supp. 1004, 1011 (D.S.C.1981).

6. *Abel v. Eli Lilly & Co.*, 94 Mich.App. 59, 289 N.W.2d 20 (1979) is not to the contrary. *Abel*'s determination that concert of action existed was based on plaintiff's allegation that such concert occurred. Because of the unusual summary judgment standard applied in Michigan, this bare allegation was sufficient to withstand the motion. 289 N.W.2d at 25. That is not so in the federal system. Fed.R.Civ.P. 56.

7. The *Bichler* court cites *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), as support for its finding of an agreement from "conscious parallel activity." 436 N.Y.S.2d at 633. In *Interstate Circuit*, an antitrust case, the Supreme Court reviewed the conduct of the several defendants charged with combining in restraint of trade, concluding that the only explanation for their "radical departure from the previous business practices of the industry" was their virtually unanimous acceptance of the agreement alleged by plaintiff. The court therefore upheld the inference of such an agreement. DES cases present a vastly different picture: the master filing and the use of the same chemical formula both have wholly benign explanations, and no inference of concerted tortious activity can be drawn therefrom.

genuine issue as to any fact material to the concert of action theory.

### B. *Enterprise Liability.*

Like concert of action, plaintiff's second theory—enterprise liability—would impose liability on each DES manufacturer on the basis of their group conduct. The concept of enterprise, or industry-wide, liability derives from Judge Weinstein's opinion in *Hall v. Du Pont De Nemours & Co.*, 345 F.Supp. 353 (E.D.N.Y.1972). In that case, 13 children sued six blasting cap manufacturers alleging that they had been injured in explosions of the caps. Although the six defendants were not the only possible sources of blasting caps, they did comprise virtually the entire blasting cap industry in this country. Plaintiffs based their claim on the practices of that industry in failing to take reasonable safety precautions and make reasonable warnings. They alleged that members of the industry had adhered to industry-wide safety standards and had delegated substantial safety investigation and design functions to their trade association.

The *Hall* court focused on the joint conduct of the defendants, finding that their joint control of the risk presented by their industry warranted the imposition of joint liability.[8] *Id.* at 371–76. The facts in this DES case in no way suggest application of *Hall*'s theory of joint liability. In *Hall* there were six manufacturers in the industry; here there were 149. Judge Weinstein limited his holding in *Hall* by warning against its application to a "decentralized" industry with many individual members. There was no industry-wide delegation of safety functions to a drug manufacturers' trade association; indeed, if there was any body responsible for safety in the drug industry it was the Food and Drug Administration.

■ Accordingly, like the many other courts that have considered the question, this Court finds that the enterprise liability theory espoused in *Hall* cannot support liability in this DES case. *See, e.g., Ryan, supra* at 1017; *Namm v. Charles E. Frosst & Co.*, 178 N.J.Super. 19, 427 A.2d 1121, 1129 (N.J.App.Div.1981); *Sindell, supra*, 26 Cal.3d 588, 163 Cal.Rptr. at 141–42, 607 P.2d at 633–35.

### C. *Alternative Liability.*

The remaining two theories relate not to the joint conduct—and therefore joint liability—of defendants, but to the element of causation. The first of these causation theories, that of alternative liability, is based on several decisions, most notably *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948) and *Ybarra v. Spangard*, 25 Cal.2d 486, 154 P.2d 687 (1944).[9] It has been nicely distilled:

> Where the conduct of two or more actors is tortious, and is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one of them has caused it, the burden is upon each such actor to prove that he has not caused the harm.

Restatement (Second) of Torts § 433B(3) (1965). Thus, in its classic application, the theory requires each hunter who negligently shot at plaintiff to prove that his bullet did not cause the injury. Failing such proof, both are liable. *Summers v. Tice, supra.*

The theory cannot apply in this DES case because plaintiffs, by their own admission, cannot show that one of the defendants caused the injury. *See* Amended Complaint ¶ 32. Indeed, the very court that developed

---

**8.** Judge Weinstein went on, however, to discuss the policy basis for imposing liability on an entire industry under *Hall*'s circumstances: "[T]he entire blasting cap industry and its trade association provide the logical locus at which precautions should be taken and liability imposed." 345 F.Supp. at 378. This discussion, rooted in large part in the ideas of Professor Calebresi, gives further support to this court's conclusion that imposition of industry-wide liability is inappropriate in a DES case. *See* Calebresi, *Some Thoughts on Risk Distribution and the Law of Torts*, 70 *Yale L.J.* 449 (1961).

**9.** The parties have cited no Florida case adopting this theory. The Court assumes without deciding that it would be applied in an appropriate case by the Florida courts.

this often useful theory has recognized that it cannot apply in a DES case in which all possible manufacturers of the pills in question are not joined. *Sindell, supra,* 26 Cal.3d 588, 163 Cal.Rptr. at 139, 607 P.2d at 931.

### D. Market Share.

 The final theory urged by plaintiffs, termed that of market share, was formulated by the Supreme Court of California as an extension of its alternative liability doctrine. In *Sindell, supra,* a DES plaintiff asserted several theories in support of recovery despite her inability to prove which company caused her injury. After rejecting each of the three theories discussed above, the court adopted a novel—perhaps radical—means of allowing plaintiff to circumvent the element of causation.

The *Sindell* court held that plaintiff need only show that her condition was caused by the drug DES and that those companies joined as defendants produced a substantial share of the DES pills on the market when plaintiff's mother took the drug. Upon such a showing, each defendant would be held liable according to its share of the market unless it could prove that it did not manufacture the pills in question. Thus, the California court shifted the burden just as it had in *Summers v. Tice, supra,* despite the possibility that no defendant caused the injury. The court based its holding on the "rough justice" of the result: the adjudication of many DES cases under this theory would assertedly lead to each manufacturer being responsible for that share of the total DES liability that is proportional to its share of the DES produced.

The market share theory unquestionably represents a radical departure from the traditional concept of causation. Plaintiffs argue at length that the development of product liability law in Florida suggest a loosening of the causation requirement, and

therefore that Florida would adopt *Sindell.* Plaintiffs' position is not advanced by their argument that Florida has adopted strict liability, *see West, supra,* and rejected the defense of contributory negligence in favor of the comparative negligence doctrine. *See Hoffman v. Jones,* 280 So.2d 431 (Fla. 1973). These developments are typical of the progress of product liability law over the last quarter century, and cannot be said to indicate a trend in Florida to abandon the element of causation in such cases. *See* Prosser, *The Fall of the Citadel (Strict Liability to the Consumer),* 50 Minn.L.Rev. 791 (1966).

Plaintiff also challenges Florida's adherence to the causation requirement by citing a few Florida decisions permitting product liability plaintiffs to prove essential elements of their case by parol evidence, *see McCarthy v. Florida Ladder Co.,* 295 So.2d 707 (Fla.App.1974), or by the use of a variant of the doctrine of *res ipsa loquitur. See Cassisi v. Maytag Co.,* 396 So.2d 1140 (Fla. App.1981). These cases certainly show that Florida takes a realistic view of the problems of proof facing product liability plaintiffs. They do not indicate, however, that Florida courts are inclined to remedy such problems by abandoning fundamental principles of product liability law.[10]

In deciding a diversity case, a federal court is bound to apply the law of the forum. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If the courts of that state have not resolved the legal issue facing the federal court, then that court must determine what path the state courts would follow if the issue were before them. *Delduca v. United States Fidelity & Guaranty Co.,* 357 F.2d 204 (5th Cir. 1966). This Court finds no indication in the decisions of the courts of this state that they would follow *Sindell* in departing from the fundamental require-

---

**10.** *Sindell's* holding is undoubtedly a radical departure from normal causation. In *Mizell v. Eli Lilly & Co.,* 526 F.Supp. 589 (D.S.C.1981), plaintiff's mother bought DES pills in California. Bound to apply South Carolina principles of choice of laws, *Klaxon Co. v. Stentor Elec-*

*tric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the district court held that *Sindell's* theory was so antithetical to South Carolina public policy that it would not apply California law even though the injury occurred in that state.

ment of causation.[11] *See Martin v. Johns-Manville Sales Corp.*, No. 81–88 Civ T–GC (M.D.Fla. August 28, 1981) (Carr, J.).

Accordingly, this Court is of the opinion that defendants' motions for summary judgment should be, and they are hereby GRANTED.

---

**11.** *In Hardy v. Johns-Manville Sales Co.*, 509 F.Supp. 1353 (E.D.Tex.1981), the court considered a state's adoption of fault-based contribution among product liability tortfeasors to indicate that the state would adopt *Sindell* as well. Florida has enacted the Uniform Contribution Among Joint Tortfeasors Act, which permits contribution according to the degree of fault of each tortfeasor. Fla.Stat.Ann. § 768.-31(3) (Supp.1981). Even if Florida would permit contribution according to "causative fault" in a strict liability case, this Court does not consider that development to indicate that Florida would follow California in abandoning the requirement of causation.